**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Docket No. 3:98-cr-45** |
| | ) | **The Hon. Claude M. Hilton** |
| **JERMAINE JERRELL SIMS,** | ) | |
| | ) | |
| *Defendant.* | ) | |

## DEFENDANT'S MOTION TO REDUCE SENTENCE
## PURSUANT TO THE FIRST STEP ACT OF 2018

Defendant, Jermaine Jerrell Sims, by counsel, respectfully moves this Court for an order reducing his sentence to time served based on the "extraordinary and compelling reasons" discussed below, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

## INTRODUCTION

Jermaine Jerrell Sims is deserving of relief from the mandatory life sentence he has been serving for twenty-two years. The incredible and disproportionate length of Sims' sentence, as a consequence of his rejection of a government offer of a minimal three-year maximum sentence, his young age at the time of his arrest, his exemplary record over the course of his incarceration, and his trial judge's recognition of the injustice of his sentence, establish "extraordinary and compelling reasons" to reduce Sims' sentence.

The late U.S. District Judge Richard L. Williams, the presiding judge at Sims' trial and sentencing, imposed the mandatory life sentence with great reluctance, expressing frustration at the court's inability to consider the mitigating circumstances that were clearly present in this

case.  In what is surely an exceptionally rare, if not unique circumstance, Judge Williams, and Sims' defense attorney, the late U.S. Magistrate Judge Dennis W. Dohnal, were united in their efforts to advocate for clemency in Sims' case.  The circumstances of the case compelled both jurists to speak on Sims' behalf on numerous occasions, characterizing Sims' lengthy sentence and continued incarceration as a travesty of justice and "a prime example of the inequity and basic unfairness" of certain mandatory minimum sentencing laws.

While Sims was sentenced on charges related to the 1997 NationsBank robbery in Richmond, he was never charged, or viewed, as a principal. Sims was not involved in the bank robbery itself, was nowhere near the bank at the time it occurred, and did nothing to assist the actual perpetrators after the robbery.  The allegations against Sims involved his providing two firearms to the principal defendants at some point before their use in this unfortunately fatal event. Neither of the firearms Sims sold to the robbers was the murder weapon. In fact, the Court released Sims pending trial, compelling evidence of the relative insignificance the government placed on his culpability.

Prior to trial, Sims was offered a plea deal reducing the charges to only one, for misprision of a felony, with a maximum punishment of three years in prison.[1] (Feb. 11, 2009 letter from [Mag. Judge] Dennis W. Dohnal to Pardon Attorney) (Ex. 1, attached).  Rather than accept that offer, Sims foolishly proceeded to trial, believing he could prove his innocence. Unable to persuade Sims to accept the plea, counsel advised him to waive a jury and try the case to the bench.  Counsel believed that, under the facts of the case, Judge Williams, knowing of the

---

[1]  This result takes to its most extreme the so-called "trial penalty." *See, e.g., United States v. Anglin*, 846 F.3d 954, 958, 965-66 (7th Cir. 2017) (230 month sentence for Hobbs Act robbery, where inchoate plea agreement was for a recommendation of seven to twelve years).

applicable mandatory sentence of life imprisonment, would accept Sims' explanation that he bought the guns for sport, not criminal activity. (*Id.*).

Sims was just twenty-one years old at the time of his arrest. He had no prior felonies, no experience with the federal criminal justice system, and no true appreciation for his situation. Today, Sims is forty-two years old, having spent half his life incarcerated for conduct the government thought deserving of only *three years* in prison.

Despite the devastating consequences of the naive exercise of his right to a trial, based on his belief in his innocence, Sims has taken every opportunity to better himself and act as a model prisoner. Not only has Sims not had an institutional charge of any kind since 1999 - over two decades ago - he has dramatically furthered his education and continues to be a role model for other inmates. Through dedication and earnest effort, Sims has completed over one hundred educational courses and obtained multiple vocational and teaching certifications.

This proceeding is the first opportunity for this Court to review Sims' "extraordinary and compelling" circumstances, with any substantial legal basis to provide relief. Thanks to the § 3582(c)(1)(A) amendments enacted as part of the First Step Act of 2018, the Court is empowered to bring a measure of justice to Sims' sentence. *See* P.L. 115-391, 132 Stat. 5194, at § 603 (Dec. 21, 2018). Sims asks the Court to do just that for the reasons set forth below.

## STATEMENT OF FACTS

On January 30, 1997, two armed men, LaFawn Bobbitt and Rashi Jones, robbed the NationsBank in Richmond, Virginia, killing a bank teller and wounding three others. Two of the three firearms Bobbitt and Jones possessed had been purchased by Sims, using his own name and correct address. Based on that, the Government indicted Sims on February 17, 1998, on six

charges related to conspiracy and aiding and abetting a bank robbery resulting in the death of another.  Initially, all charges were dismissed on the government's own motion.  However, the government obtained superseding indictments on March 26, 1998, and, again, on June 2, 1998, each with an additional two charges.  The indictments charged Sims with conspiracy, in violation of 18 U.S.C. § 371 and § 2 (count 1); aiding and abetting bank robbery, in violation of 18 U.S.C. § 2113(a), (d) and (e) and § 2 (count 2); aiding and abetting use of semi-automatic assault weapon in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1) and § 2 (count 3); aiding and abetting causing death of another through use of a firearm, in violation of 18 U.S.C. § 924(j)(1) and § 2 (count 4); false statement in connection with obtaining a firearm, in violation of 18 U.S.C. § 922(a)(6) and § 924(a)(2) (count 5); and transfer of a firearm for use in a crime of violence, in violation of 18 U.S.C. § 924(h) (count 6).

Prior to trial, Sims was offered a plea agreement, under which he would have pled guilty to one count of *misprision of a felony,* pursuant to 18 U.S.C. § 4, with a statutory maximum sentence of three years in prison.  However, Sims—young and lacking experience with the criminal justice system and, most particularly, the federal system—did not understand the significance of the plea offer, nor did he fully grasp the risks associated with a trial.  Thus, when Sims' counsel did not urge him to accept the plea offer, he proceeded to trial, waiving, on the advice of his attorney, his right to a jury. (Ex. 1).  Contrary to the expectations of Sims' counsel, Judge Williams found Sims guilty of all charges.  He sentenced Sims to life imprisonment plus 120 months, consisting of 60 months on count 1, mandatory life imprisonment on count 2, life imprisonment on count 4, and 120 months on counts 5 and 6, all to run concurrently, and 120 months on count 3, to run consecutively to the other sentences.  Judge Williams made a

compelling statement on the record at Sims' sentencing, indicating a life sentence, in this case, amounted to cruel and unusual punishment under the Eighth Amendment, while noting that the Fourth Circuit would not endorse such a conclusion. (Sentencing Transcript, at  26-27, *United States v. Sims*, 3:98 CR 45-01 (1999) (ECF # 84) (Ex. 10, attached hereto)).  Judge Williams was proven right when that court denied Sims' appeal, which had raised, *inter alia*, that Eighth Amendment issue. *See, United States v. Sims,* 2000 U.S. App. LEXIS 380 (4th Cir. Jan. 12, 2000).

During his many years of incarceration, Sims has been a model prisoner and has received extraordinary support for relief or clemency—most notably from Judge Williams, himself.  In one of his several letters to the Pardon Attorney on Sims' behalf, Judge Williams stated, "if a case ever deserved pardon relief, Sims' case falls in that category."  In another, he emphasized his "sincere[] belief that [Sims'] situation is . . . a prime example of the inequity and basic unfairness of mandatory minimum sentencing as imposed by congressional mandate." (Dec. 30, 2008 letter of Judge Richard L. Williams to Pardon Attorney) (Ex. 2,attached).  Judge Williams also spoke admiringly of Sims' "remarkable achievements and the positive attitude"—especially in the light of his harsh circumstances.  He further praised the way Sims "availed himself of all educational and vocational opportunities available to him[.]" (Feb. 11, 2009 letter of Judge Williams to Pardon Attorney) (Ex. 3, attached), a circumstance he again noted a year later. (Dec. 8, 2009 letter of Judge Williams to Pardon Attorney) (Ex. 4, attached).  Regrettably, even though Judge Williams continued to support clemency for Sims, his application was denied in 2011 and, again, after Judge Williams' death, in 2017.

On or about January 19, 2020, Sims submitted an electronic request to the warden at FMC Butner that he move this Court for a reduction of his sentence under 18 U.S.C. § 3582(c)(1)(A)(i).  As of the date of this filing, no such motion has been filed by BOP.  While Sims has filed previous *pro se* motions for relief under 28 U.S.C. § 2255 and previous versions of 18 U.S.C. § 3582(c), this proceeding is the first opportunity for this Court to review Sims' "extraordinary and compelling" circumstances with any substantial legal basis to provide relief.

## DISCUSSION

The Court now has the authority to reduce Mr. Sims' sentence based on the extraordinary and compelling circumstances presented here.  The changes made to the compassionate release statute by the First Step Act grant this Court the jurisdiction to hear this motion.  Congress' amendments to 18 U.S.C. § 3582(C)(1)(A)(i) have finally empowered courts with independent authority to decide when extraordinary and compelling circumstances warrant a sentence reduction.  Those extraordinary and compelling reasons are present here, because Sims' mandatory life sentence neither reflects his actual culpability, nor what the government itself deemed proportionate punishment for his offense.  Moreover, it does not reflect the transformed person he is today.  While most young men would probably be crushed under the weight of a life sentence after rejecting an offer of three years, as Judge Dohnal noted from his own extensive experience (Ex. 1), Sims has grown substantially, from the post-adolescent he was at the time of his arrest to an accomplished man with a remarkable record of rehabilitation and redemption.  The circumstances presented in this case justify compassion and Sims asks this Court to grant a sentence reduction.

**I.  THE COURT HAS AUTHORITY TO RESENTENCE SIMS OR GRANT COMPASSIONATE RELEASE UNDER SECTION 3582(C)(1)(A)(I) FOR THE EXTRAORDINARY AND COMPELLING REASONS PRESENTED HERE.**

**A. The Court Has Jurisdiction Because Sims Has Exhausted All Administrative Remedies.**

Congress first enacted the modern form of the compassionate release statute contained in 18 U.S.C. § 3582 as part of the Comprehensive Crime Control Act of 1984.  Section 3582(c) provides that a district court can modify even a final "term of imprisonment" in four situations, one of which was the existence of "extraordinary and compelling reasons" warranting the reduction, as determined by the sentencing court. 18 U.S.C. § 3582(c)(1)(A)(i).  However, though the statute gave courts the final decision-making authority over whether a sentence would be reduced, the statute imposed a gatekeeper—in that authority could be invoked only upon a motion by the Director of  BOP.  Absent such a motion, sentencing courts were powerless to reduce a prisoner's sentence, even if extraordinary and compelling reasons warranted the reduction. 18 U.S.C. § 3582(c)(1)(A)(i); *see also* PL 98–473 (HJRes 648), PL 98–473, 98 Stat 1837 (Oct. 12, 1984).

Due to the amendments to the statutory scheme made by the First Step Act of 2018, district courts are no longer required to wait for a motion by the Director of the BOP to resentence a federal prisoner under 18 U.S.C. § 3582(c)(1)(A)(i). *See* P.L. 115-391, 132 Stat. 5194, at § 603 (Dec. 21, 2018).  The Fourth Circuit Court of Appeals, in *United States v. McCoy*, addressed this issue holding,

> . . . [T]he First Step Act significantly expanded access to compassionate release under 18 U.S.C. § 3582(c)(1)(A). Prior versions of § 3582(c)(1)(A), which empowers courts to reduce sentences for "extraordinary and compelling reasons," had allowed review of sentences only at the request of the Bureau of Prisons ("BOP"). The First Step Act

> removed the BOP from that gatekeeping role, authorizing defendants
> themselves to file for motions for sentence reductions."

*United States v. McCoy*, 981 F.3d 271, 2020 U.S. App. LEXIS 37661, at \*2-3, 2020 WL

7050097 (4th Cir. Dec. 2, 2020).

Though not required under the Fourth Circuit's interpretation of the First Step Act, as

noted above, Sims submitted an electronic request to the warden at FMC Butner on or around

January 19, 2020.  As of the date of this filing, BOP has not filed a motion with this Court on

Sims' behalf.  Because more than 30 days have lapsed since the records office at FMC Butner

received Sims' request, and no motion has been filed by the Warden on his behalf, Sims has

exhausted all available administrative remedies. Accordingly, Sims is entitled to bring his motion

directly to the Court pursuant to 18 U.S.C. § 3582(c)(1)(A), and this Court has jurisdiction to

rule on the requested relief.

**B.  Consistent with the Text of Section § 3582(c)(1)(A), the Legislative Intent of the First Step Act, and the Sentencing Commission's Policy Statement, This Court Has Discretion to Grant the Relief Requested Here.**

*1.  Congress Did Not Limit "Extraordinary and Compelling Reasons" to a Specific, Enumerated Set of Circumstances.*

Congress has not defined what constitutes an "extraordinary and compelling reason" for

resentencing under § 3582(c).  However, the legislative history confirms that Congress intended

for federal sentencing courts to have broad discretion to make those determinations on a

case-by-case basis and to reduce fundamentally unfair sentences where such reasons exist.  One

of Congress' initial goals in passing the Comprehensive Crime Control Act was to abolish

federal parole and create a "completely restructured guidelines sentencing system." S. Rep No.

98-225, at 52, 53 n.74 (1983).  Yet, with the elimination of parole as a corrective measure in

cases warranting early release, Congress recognized that some individual cases need a second look and stressed the need for an alternative review process.  It, therefore, allowed for judicial reduction of certain sentences under § 3582(c):

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which *other extraordinary and compelling circumstances* justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment.

*Id.* at 55–56 (emphasis added).  Rather than having the Parole Commission review every federal sentence from a perspective focusing solely on rehabilitation, Congress conferred broad discretion on the courts to decide, in individual cases, if "there is a justification for reducing a term of imprisonment." *Id.* at 56.

Congress intended for the situations listed in § 3582(c) to act as "safety valves for modification of sentences," enabling sentence reductions when justified by factors that previously could have been addressed through the (now abolished) parole system. *See id.* at 121. This approach was intended to keep "the sentencing power in the judiciary where it belongs," rather than with a federal parole board, and permitted "later review of sentences in particularly *compelling situations.*" *Id.* (emphasis added).

>    2.    *The First Step Act gave the courts broad discretionary authority to determine whether "extraordinary and compelling reasons" are present in compassionate release motions.*

The 2018 First Step Act Amendments further clarify Congress's intent for the courts to utilize their judicial wisdom to evaluate whether "extraordinary and compelling reasons" exist in a defendant's case.

The amendments specifically removed the BOP as the sole gatekeeper for compassionate release motions by empowering defendants to file a motion on their own, despite BOP opposition or refusal to support. *See* 18 U.S.C. § 3582(c)(1)(A); *see also McCoy*, 981 F.3d at __, 2020 U.S. App. LEXIS 37661, at *2-3 (4th Cir. Dec. 2, 2020) (holding that "Congress amended § 3582(c)(1)(A) to 'remove the Bureau of Prisons from its former role as a gatekeeper over compassionate release petitions'").  The empowerment of defendants to move for compassionate release on their own was "a break with over 30 years of procedure – not a "minor or inconsequential change. Congresspersons called it 'expand[ing],' 'expedit[ing],' and 'improving' compassionate release." *United States v. Brooker*, 976 F.3d 228, 235 (2d Cir. 2020) (citing statement of Sen. Ben Cardin, 164 Cong. Rec. S7774 (daily ed. Dec. 18, 2018); statement of Rep. Jerrold Nadler, 164 Cong. Rec. H10346, H10362 (Dec. 20, 2018)).

When courts evaluate the applicability of the "extraordinary and compelling reasons" clause, the statute "requires such courts to consider only 'applicable' guidelines." *Id*.  Prior to the 2018 amendments, Guideline § 1B1.13 and Application Note 4(D) were the primary applicable guidelines for BOP evaluations for compassionate release motions. *Id.* at *16.  The language of Guideline § 1B1.13 applies the recommendations and instructions contained therein solely to the BOP.  *See* Guideline § 1B1.13 ("[u]pon motion of the Director of the Bureau of Prisons . . . .").  Application Note 4 is similarly constrained, stating that "[a] reduction under this policy statement may be granted *only upon motion by the Director of the Bureau of Prisons* . . . ." U.S.S.G. § 1B1.13, n.4. (emphasis added).  The Fourth Circuit held in *McCoy* that Guideline § 1B1.13 does not apply to District Court analyses of compassionate releases motions brought under the First Step Act. *See McCoy*, 981 F.3d at __, 2020 U.S. App. LEXIS 37661, at *20 (4th

Cir. Dec. 2, 2020) (holding that "[w]hen a defendant exercises his new right to move for

compassionate release on his own behalf . . . § 1B1.13 does not apply, and thus §

3582(c)(1)(A)'s consistency requirement does not constrain the discretion of the district courts);

*see also*, *United States v. Jones*, 930 F.3d 1098, 2020 U.S. App. LEXIS 36620, at *7-9 (6th Cir.

Nov. 20, 2020).

      The *McCoy* Court also determined that, as of December 2, 2020,

> [T]here is no Sentencing Commission policy statement 'applicable' to the
> defendants' compassionate-release motions, which means the district
> courts need not conform, under § 3582(c)(1)(A)'s consistency
> requirement, to § 1B1.13 in determining whether there exist 'extraordinary
> and compelling reasons' for a sentence reduction."

981 F.3d at ___, 2020 U.S. App. LEXIS 37661 at *25 (4th Cir. Dec. 2, 2020).  After

establishing that no Sentencing Commission policy exists that is applicable to a court

ruling on a post-First Step Act Compassionate Release Motion, the Court held,

> "where the Commission fails to act, then courts must make their
> own independent determinations of what constitutes an
> 'extraordinary and compelling reason[]' under § 3582(c)(1)(A), as
> consistent with the statutory language, which 'directly instructs
> *courts* to find that 'extraordinary circumstances exist.'"

*Id*. (citing *United States v. Rodriguez*, 451 F. Supp.3d 392, 400 (E.D.Pa. 2020)).

      Because Congress clearly intended to revoke the BOP's position as the gatekeeper of

compassionate release motions by empowering defendants to move for such relief on their own,

courts must be permitted to determine whether "extraordinary and compelling reasons" exist to

substantiate a motion under § 3582(c)(1)(A)(i). *See generally id.*  The Guidelines that were

applicable to the evaluation of "extraordinary and compelling reasons" prior to the First Step Act

in 2018 are not applicable to motions made by defendants, as those Guidelines explicitly

constrain their application to "motion[s] from the Director of the Bureau of Prisons . . . ." *See*

*McCoy*, 981 F.3d at ___, 2020 U.S. App. LEXIS 37661, at *8.  The Sentencing Commission has not, as of December 2, 2020, introduced any applicable policy statements that would constrain the Court's discretion.  Consequently, the Court is free to evaluate and determine, for itself, whether a defendant's circumstances qualify as "extraordinary and compelling" under § 3583(c)(1)(A). *See, id.* at *25. *See, also*, *Brooker*, 976 F.3d at 235; *Jones*, 930 F.3d at ____, 2020 U.S. App. LEXIS 36620, at *7-9 (6th Cir. Nov. 20, 2020); *United States v. Gunn*, 960 F.3d 1178, 2020 U.S. App. LEXIS 36612, at *2 (7th Cir. Nov. 20, 2020).

Judges may now assess cases individually and grant sentence reductions—even in the face of BOP inaction, delay, or direct resistance—on a full array of grounds reasonably encompassed by the "extraordinary and compelling" language of the statute. *See, e.g. McCoy*, 981 F.3d at  __, 2020 U.S. App. LEXIS 37661, at *12 (4th Cir. Dec. 2, 2020) (holding the district court properly "took seriously the requirement that they conduct individualized inquiries, basing relief not only on the First Step Act's change to sentencing laws   . . . but also on such factors as the defendants' relative youth at the time of their offenses, their post-sentencing conduct and rehabilitation, and the very substantial terms of imprisonment they already served"). The *McCoy* Court further found that, "when a defendant exercises his new right to move for compassionate release on his own behalf, § 3582(c)(1)(A)'s consistency requirement does not constrain the discretion of the district courts." 981 F.3d at ___, 2020 U.S. App. LEXIS 37661, at *20. Thus, this Court has the authority to define the contours of what constitutes "extraordinary and compelling reasons" for purposes of § 3582(c)(1)(A)(i) and make an independent assessment of whether the circumstances of Sims' case warrant a reduction of his harsh sentence.

## II.  THE CRITERIA FOR REASSESSING SIMS' SENTENCE STRONGLY WEIGH IN FAVOR OF GRANTING HIM COMPASSIONATE RELEASE

In determining whether an individual's sentence should be reduced, the Court must decide, *inter ali*a, whether he or she presents a danger to the safety of any other person or to the community based on the factors enumerated in 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13(2). When an individual is not a danger, the Court should assess whether the individual's sentence complies with the purposes for sentencing and consider the factors set forth in 18 U.S.C. § 3553(a).

Sims' history and record conclusively demonstrate he is not a danger to others or to the community.  To the contrary, if released, he would be a contributing member to his community. Further, the § 3553(a) factors weigh strongly in favor of relief in Sims' case.

### A.  Sims Is Not a Danger to Others or to the Community

Sims is neither a danger to the community, nor to any other person. The circumstances of Sims' involvement in the Nationsbank robbery and the evolution of his character over the nearly twenty-two years he has been incarcerated precludes a finding that he poses a danger.

Sims' life sentence was not based on an assessment of his future dangerousness or any perceived need to incapacitate him.  Sims had no felony record or history of violence, prior to his arrest on the charges for which he is presently incarcerated; he had only a minor misdemeanor record.  Sims' life sentence was, instead, the result of an inflexible, minimum sentence mandate that produced the most extreme "trial penalty" the judicial system can impose on a defendant who exercises his constitutional right to a trial and to hold the government to its burden of proof. *See*, n.1, *supra*, p. 2.  Indeed, Judge Williams stated that sentencing Sims to life imprisonment

was a painful experience and he expressed frustration at not being able to depart from the mandatory minimum, even though "Sims' culpability relative to that of [the perpetrators] was less" and "several unique evidentiary circumstances . . . mitigated against him (sic) having to receive the same mandatory life sentence to which the actual perpetrators were sentenced." (Ex. 10, p. 26); (Ex. 3).

The fact that Sims was not only released pending trial, but also offered a plea deal with a three-year maximum sentence, underscores how neither the Court, nor the government, viewed Sims as a danger.  According to Judge Dohnal, Sims even remained steadily employed preceding and during his trial "without any indication of non-compliance with his terms of release." (Ex. 1).

 It would be disingenuous in the extreme for the government to argue otherwise now, when Sims' record since his incarceration actually confirms his lack of dangerousness.  Sims has not received any infractions or intuitional charges of any kind since 1999.  Rather, he has spent his time pursuing every opportunity to improve his mind and character.  Sims has participated in thousands of hours of programs, including well over 100 educational classes. (2015 Inmate Skills Development Plan) (Ex. 5, attached); (Affidavit of Defendant) (Ex. 9, attached), and had become a Transitions Inmate Mentor, a facilitator for Alternative to Violence Project Classes and a Suicide Watch Companion (Ex. 6, attached); (Ex. 9).

Additionally, Sims' work supervisor has noted that he is self-driven, dependable, and a vital team-member, who constantly seeks self-improvement and assists others. (Jan. 29, 2010 Memo from C. Bibbs, Cook Foreman to R. McNeill, Counselor) (Ex. 7, attached).  And Sims was observed by a re-entry professional to be respectful, helpful, and a "positive force for any employer, group or project to which he applies himself." (Jan. 17, 2019 letter from Sue

Kastensen, Founder & Dir. of Fair Shake Reentry Resource Ctr., to Pardon Attorney) (Ex. 8, attached).  His dedication to becoming a "valuable and respected citizen," as well as his "commitment to strengthening himself and others," are apparent. *See id*.

In sum, Sims' conduct demonstrates his dedication to preventing violence, his encouragement of true rehabilitation in others, as well as in himself, and his belief that second chances should be earned through hard work and sincere self-improvement. Sims has become a role model for other inmates and a man who would be an asset, rather than a danger, to the community.

**B.  Sims' Case Presents Extraordinary and Compelling Reasons for His Sentence to Be Reduced.**

By way of example, Thomas McCoy, 19 years old at the time of the twelve robberies he committed, pleaded guilty to two counts of Hobbs Act robbery under 18 U.S.C. § 1951 and two counts of using firearms in connection with those robberies under § 924(c).  The Court was compelled to sentence him to 32 years imprisonment for the § 924(c) convictions due to mandatory minimums, plus the minimum possible sentence for the robberies, 37 months. In total, McCoy was sentenced to just over 35 years in prison.

Following passage of the First Step Act, McCoy filed a Compassionate Release Motion under § 3582(c)(1)(A).  The District Court held that his incarceration constituted an "extraordinary and compelling reason" for a reduction of his sentence for three reasons: (1) the "incredible length of the 32-year mandatory sentence imposed . . . far exceeded that necessary to achieve the ends of justice;" (2) his relatively young age (19) at the time of the offense; and (3) his rehabilitation, demonstrated through educational and vocational achievements, as well as payment of a significant amount of his restitution.  The court reduced his sentence from 421

months to 205 months (time served). *See, United States v. McCoy*, 2020 U.S. Dist. LEXIS 91801 at \*17-18 (E.D. Va. May 26, 2020), *aff'd*, 981 F.3d 271, 2020 U.S. App. LEXIS 37661 (Dec. 2, 2020).

Similarly, Sims was charged with counts involving bank robbery and § 924(c).  Like McCoy, Sims was relatively young - with only two years separating them.  Also like McCoy, Sims has done everything in his power to prepare himself for success while in prison, including becoming bilingual (Spanish and English), going to college, learning various trades, completing Adult Continuing Education programs, mentoring young inmates, and becoming an official Alternatives to Violence Project (AVP) Facilitator.[2] (Exs. 5, 9).  And while McCoy personally committed the multiple robberies of which he was convicted, and others with which he was originally charged, Sims was charged and convicted of bank robbery only as an aider and abetter, as he was not present at the bank robbery and did not participate in any way, except to sell two guns to the actual perpetrators.

Having exhausted his claim for a reduction of sentence under the compassionate release provision, Sims presents this Court with extraordinary and compelling reasons for reducing his sentence.  Sims' sentence presents extraordinary and compelling reasons justifying relief for three reasons: first, the incredible length of Sims' sentence is vastly disproportionate to his culpability and is inconsistent with the goals of our criminal justice system; second, while Sims was not a juvenile at the time of his arrest, his young age supports a lesser sentence; and third, Sims' accomplishments and exemplary record over the course of his incarceration demonstrate rehabilitation worthy of a sentence reduction.

---

[2] https://avpnc.org.

*1. The Disproportionate and Inequitable Length of Sim's Mandatory Minimum Life Sentence Compared to His Culpability Weighs in Favor of Reducing His Sentence.*

At its heart, sentencing law, and the constitutional demands that underlie it, embody our society's sense of fundamental fairness.  Above all else, sentencing demands that punishment fit the crime.  Thus, 18 U.S.C. § 3553(a) calls for a sentence that is sufficient, *but not greater than necessary*, to comply with the particular purposes that justify sentencing. These purposes are defined by § 3553(a)(2), which states, among other factors, that an imposed sentence must reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

In passing the First Step Act, Congress concluded that the punishments arising from stacking provisions of 18 U.S.C. § 924(c) were too punitive and unfair, and courts, including the Fourth Circuit Court of Appeals, have overwhelmingly responded by granting compassionate release for disproportionate sentences. *See, e.g., McCoy*, 981 F.3d at ___, 2020 U.S. App. LEXIS 37661 (4th Cir. Dec. 2, 2020); *United States v. Scott*, 2020 U.S. Dist. LEXIS 84313 (D. Md. May 13, 2020), *aff'd by, McCoy*, 981 F.3d 271, 2020 U.S. App. LEXIS 37661 (4th Cir. Dec. 2, 2020); *United States v. Decator*, 452 F.Supp.3d 320 (D. Md. 2020), *aff'd by, McCoy*, 981 F.3d 271, 2020 U.S. App. LEXIS 37661 (4th Cir. Dec. 2, 2020); *United States v. Redd*, 844 F.Supp.3d 717 (E.D. Va. 2020); *see also United States v. O'Bryan*, 2020 U.S. Dist. LEXIS 29747 at *5 (D. Kan. Feb. 21, 2020) (granting relief based on rehabilitation and unreasonable length of sentence for § 924(c) conviction); *United States v. Maumau,* 2020 U.S. Dist. LEXIS 28392 at *12 (D. Utah Feb. 18, 2020) (finding "age, the length of the sentence imposed, and the fact [the defendant]

would not receive the same sentence if the crime occurred today" to be extraordinary and compelling grounds for sentence reduction).

While "aiding and abetting" historically results in the same treatment as that applied to a principal in the offense, Sims' sentence is disproportionate, as Judge Williams realized.  In eliminating the stacking of  § 924(c) charges, *see*, § 924(c)(1)(C), Congress demonstrated its intent to address inequitable sentencing caused by mandatory sentencing constraints and common, unreasonable prosecutorial practices.  The mandatory minimum behind Sims' sentence, and its stark departure from the plea he was offered, make Sims' circumstances just such a case.

Mandatory minimum sentencing mandates have been criticized by judges and attorneys alike as blunt instruments that, rather than serving their original, intended purpose—"to impose harsher punishments on a select group of the most culpable defendants"—have instead resulted in unfair sentences and a severe power imbalance during plea negotiations. *See, e.g.,* Nat'l Ass'n of Crim. Def. Law., The Trial Penalty: The Sixth Amendment Right to Trial on The Verge of Extinction and How to Save It 3 (2018)[3] [hereinafter Trial Penalty Report].  While presiding judges are meant to retain ultimate authority over final sentencing decisions, in practice, mandatory minimum sentence statutes prevent judges from exercising discretion.  Rather than allow assessment of culpability and mitigating circumstances on a case-by-case basis, mandatory minimum penalties are triggered solely by the prosecutor's charging decisions.  Compassionate release and § 3582(c) provide an appropriate method to give secondary review to these sentences and remedy any inequities.  Courts considering § 3553(a) factors have found sentencing courts' concerns about mandatory minimums and sentence disproportionality support finding

---

[3] www.nacdl.org/trialpenaltyreport

extraordinary and compelling reasons to reduce a sentence. *See, e.g., Maumau,* 2020 U.S. Dist.

LEXIS 28392, at *11 (finding support for sentence reduction where the court "repeatedly

expressed its concern regarding the length" of a sentence); *United States v. Chan*, 2020 U.S.

Dist. LEXIS 56232, at *4-5 (N.D.Ca. March 31, 2020) (court would grant relief where the

sentencing judge did not want to impose a mandatory minimum when it resulted in a sentence

significantly greater than § 3553(a) justified).

Judge Williams expressed deep concerns about Sims' sentence on numerous occasions, at

the sentencing hearing and after.  First, because Sims' culpability in providing a firearm to

another is simply not the same as that of two perpetrators who robbed a bank and fatally shot a

teller. *E.g.,* Ex. 10, p. 26 ("Although the law makes no distinction between aiders and abetters

and principals in the first degree, Mr. Sims' role in the bank robbery was different from that of

[the principal perpetrators.]").  **Second, giving Sims the same sentence as the principal**

**perpetrators, in the face of his lesser culpability, neither "reflect[s] the seriousness of the**

**offense" nor "provide[s] just punishment for the offense," as proscribed by §3553(a)(2)(A)**.

(Ex. 3) **(Judge Williams stating, under the circumstances, Sims should not have "to receive**

**the same mandatory life sentence to which the actual perpetrators were sentenced")**.

Indeed, even as he acknowledged that his hands were tied as to sentencing, Judge Williams

bothered to note that the circumstances of the case "would warrant departure from the guideline

range." (Ex. 10, pp. 25-26)  And, in his December, 2009 letter to the Pardon Attorney, *eleven*

*years ago*, Judge Williams expressed his frustration with the absence of any relief for Sims.

(Ex. 4) ("What is the present status of the matter?  A significant amount of time has gone by, and

both Judge Dohnal and I have a genuine interest in getting the problem resolved").

Excessive sentences—especially "trial penalty" sentences which are vastly disproportionate from plea offers—undermine respect for the law and the integrity of the justice system. *See* 18 U.S.C. § 3553(a)(2)(A) (mandating an imposed sentence needs to promote respect for the law); *see also* Trial Penalty Report at 3 (quoting former United States District Judge John Gleeson, E.D.N.Y.).  The fact that Sims' sentence was a "trial penalty" in the extreme is an additional reason why his case presents extraordinary circumstances justifying relief. *See e.g., Haynes*, 456 F.Supp.2d at 514 ("The Court concludes, based on the facts . . . —including the brutal impact of Haynes's original sentence, its drastic severity as compared to codefendant Rivers's ten-year term, its harshness as compared to the sentences imposed on similar and even more severe criminal conduct today, and the extent to which that brutal sentence was a penalty for Haynes's exercise of his constitutional right to trial—that the FSA' elimination of the § 924(c) sentencing weaponry that prosecutors employed to require that sentence is an extraordinary and compelling circumstance warranting relief under § 3582(c)").

It goes without saying that Sims' life sentence was a substantial penalty, when he had been offered a maximum three-year sentence prior to trial. (Ex. 1).  By rejecting a plea bargain and exercising his right to a jury trial, Sims received a life sentence for an act the government thought deserved only a maximum of three years. **That the government believed three years or less imprisonment was sufficient to satisfy the purposes of § 3553(a) *alone* demonstrates the egregious nature of Sims' sentence.**  A trial penalty that forces a defendant to either gamble with decades of his life - or as here, with his entire life - or give up his constitutional right to hold the government to its burden of proof, at a fair trial, is a deeply insidious problem, inconsistent with notions of fundamental fairness and the core values of our criminal justice system. *See,*

*e.g.,* Trial Penalty Report at 9, 39.  One way to remedy such injustices is through judicial "second looks"—such as compassionate release—which allow courts to "review lengthy sentences to ensure [they] are proportionate over time" and to act when they are not. *Id*. at 60.

    *2.  Sims' Young Age at the Time of His Arrest and Trial Weighs in Favor of Reducing His Sentence.*

    While Sims was not a juvenile at the time of his arrest when just twenty-one years old, the *Miller v. Alabama*, 567 U.S. 460 (2012) factors can nonetheless be considered in determining the existence of extraordinary and compelling reasons under § 3582(c). *See McCoy*, 981 F.3d at __, 2020 U.S. App. LEXIS 37661, at *31 (4th Cir. Dec. 2, 2020) (holding the district court was correct to "focus[] on the defendants' relative youth - from 19 to 24 - at the time of their offenses, a factor that many courts have found relevant under § 3582(c)(A)(i)."); *see also, McCoy*, 2020 U.S. Dist. LEXIS 91801 (E.D. Va. May 26, 2020) (referencing *Miller* neurological development, decision-making, and reform factors in assessing extraordinary and compelling reasons for a defendant arrested at nineteen), *aff'd*, 981 F.3d 271, 2020 U.S. App. LEXIS 37661 (4th Cir. Dec. 2, 2020).

    While the *Miller* categorical ban on mandatory sentences for life without parole for juveniles does not technically apply to defendants in their low to mid-twenties, research demonstrates that such individuals still experience many of the same behavioral, psychological, and neurological development factors that affect the ability to understand risks and consequences and to make informed, mature decisions. *See, e.g., Kathryn L. Modecki*, Addressing Gaps in the Maturity of Judgment Literature: Age Differences and Delinquency, 32 Law & Hum. Behav. 78, 85 tbl.3 (2007) (describing study finding that college-aged adults statistically shared adolescents' diminished ability to evaluate a situation before acting when compared to older adults).  Thus,

even without a categorical ban, several courts within the Fourth Circuit have found arrest at a young age, particularly when accompanied by a minimal prior criminal history and subsequent rehabilitation, favors sentence reduction in most cases. *See, McCoy*, 981 F.3d 271, 2020 U.S. App. LEXIS 37661, at *36 (4th Cir. Dec. 2, 2020) (finding the courts' consideration of the defendants' age of 19 a relevant factor to consider for compassionate release analyses)*, Scott*, 2020 U.S. Dist. LEXIS 84313 (D. Md. May 13, 2020) (finding defendant's age of 23 and lack of prior criminal record favored relief); *United States v. Bryant*, 2020 U.S. Dist. LEXIS 75681, at *9-10 (D. Md. April 30, 2020) (noting relative youth—24 years old—and minimal prior criminal record, combined with good post-sentencing conduct greatly favored relief), *aff'd by, McCoy*, 981 F.3d 271, 2020 U.S. App. LEXIS 37661 (4th Cir. Dec. 2, 2020) ; *Decator*, 452 F.Supp.3d at 325-326, *aff'd by, McCoy*, 981 F.3d 271, 2020 U.S. App. LEXIS 37661 (4th Cir. Dec. 2, 2020); *Maumau,* 2020 U.S. Dist. LEXIS 28392, at *17.

Restricting *Miller*'s logic solely to individuals under 18 is rooted in an arbitrary legal tradition and ignores the modern science the Supreme Court consulted when developing the *Miller* factors. *See e.g.*, *United States v. Chavez*, 894 F.3d 593, 609 (4th Cir. 2018) ("Contemporary 'society draws the line for many purposes between childhood and adulthood' at 18 years old. [. . .] It is true of course, that 'the qualities that distinguish juveniles from adults do not disappear when an individual turns 18" (citing *Roper v. Simmons*, 543 U.S. 551, 574, 125 S.Ct. 1183 (2005))).  Studies have repeatedly indicated that the prefrontal cortex is not fully developed until age 25. *See e.g.,* Mariam Arain, et al., *Maturation of the adolescent brain*, 9 Neuropsychiatric Disease and Treatment 449 (2013) (stating, "The fact that brain development is

not complete until near the age of 25 years refers specifically to the development of the

prefrontal cortex"). In *United States v. Streett*, the court found that

> [T]he prefrontal cortex "helps us control our impulses and regulate our emotion,"
> as well as aid in decision-making, reasoning, and planning, such that "we often
> see risk-taking behavior in adolescents because they don't have that complete
> development of the prefrontal cortex."

434 F. Supp. 3d 1125, 1161 (D.N.M. 2020) (citing the expert testimony of Sueann

Kenney-Noziska, an LCSW, therapist, lecturer on childhood trauma and its impact on

neurobiological development).  Thus, *Miller*'s underlying logic - that juveniles are less culpable

for their crimes because, *inter alia*, their brains are not fully mature in regions related to impulse

control, planning, and risk avoidance, *Miller*, 567 U.S. at 472, ought to be applied to those

individuals rather than an out-dated, arbitrary legal tradition, when science has definitively

determined persons 25-years old and younger meet the same criteria.

Sims' case perfectly comports with the *Miller* factors:

1. Adolescent brains are not fully mature in regions related to impulse control, planning ahead, and risk avoidance;

2. Adolescents cannot extricate themselves from negative family or social environments and are more vulnerable than adults to negative influences such as abuse and neglect;

3. Adolescent brains have an enhanced susceptibility to peer pressure;

4. Adolescents are less able than adults to assist in their defense and properly evaluate plea options; and

5. Because the adolescent brain is not fully formed, adolescents have a tremendous potential for rehabilitation.

*Id.* at 477. *See also* Scott, Grisso, Levick, and Steinberg, *Juvenile Sentencing Reform in a*

*Constitutional Framework* at § III, 88 Temp. L. Rev. 675, 695-703 (2016) ("*Juvenile Sentencing*

*Reform*" (discussing how to apply the five *Miller* factors).

Sims was 21-years old at the time of the incident which, according to the scientifically established and verified research, means the regions of his brain that govern impulse control, planning, and risk avoidance were underdeveloped.  That manifested itself, most obviously, by his willingness to risk a life sentence to prove the point of his innocence, even though he knew he had sold the guns used in the robbery.

Additionally, Sims' childhood was fraught with Adverse Childhood Experiences ("ACEs")[4] in the form of domestic chaos, including his father's physical and verbal abuse of his mother, and his father's perceived preference for his brother and resentment of Jermaine.  The chaos, rancor, and vitriol that permeated Sims' life took a toll on his education and relationships and drove him into the streets. (Ex. 9).

Numerous studies have demonstrated that ACEs experienced in childhood and adolescence have a profound effect on the development of key areas of the brain responsible for executive functions (i.e. decision making and risk-taking behavior), namely the prefrontal cortex. *See e.g.,* Jessie I. Lund, et al., *Adverse Childhood Experiences and Executive Function Difficulties in Children: A Systematic Review*, 106 Child Abuse & Neglect 104485 (2020) (finding that, across thirty-six studies that examined executive functions related to forms of maltreatment, including abuse, neglect, and exposure to intimate partner violence, many found a "*strong* relationship between maltreatment and [prefrontal cortex] deficits among children." (Emphasis added)).  Based on his age and history of ACEs, Sims' brain was still not fully developed in the areas of the brain that govern behavior.

---

[4] https://www.cdc.gov/violenceprevention/aces/index.html.

The sentence from which Sims seeks relief by this Motion was inflicted as the result of an aiding and abetting charge in a federal bank robbery case.  Sims was alleged to have bought the guns for the robbers, but, as Judge Williams stated, he was not in or near the bank at the time of the robbery, "as a driver, or a lookout, or anything else." (Ex. 10, p. 26).  It is clear to see the role of peer pressure in this scenario, as foreshadowed by Justice Kagan in *Miller*.

Sims' behavior throughout his trial and sentencing, including moving that his highly respected and experienced attorney withdraw at one point, plainly point to an individual who was less-than-capable of effectively assisting in his own defense.  (Ex. 10 at 2).  The very fact Sims found himself subjected to so extreme a sentence was due to his patent inability to properly evaluate his options.  It would be troubling enough if Sims had rejected a three-year plea offer when the alternative was a trial with a *maximum* sentence of life imprisonment if he were convicted, but it is something else again when, as here, the alternative was a trial with a *mandatory* sentence of life imprisonment if he were convicted.  Rolling the trial dice against the United States when life imprisonment is a possibility if one loses is reckless enough, but rolling them when life imprisonment is a *certainty* if one loses is utterly foolhardy and typical of a less than fully developed brain not fully mature in regions related to impulse control, planning ahead, and risk avoidance. *See Miller*, 567 U.S. at 477.

But perhaps the clearest example of the *Miller* factors' application to Sims comes in his demonstrated capacity for rehabilitation.  Since being incarcerated, Sims has taken every opportunity to become an educated and productive person. Sims has accomplished all of this while maintaining consistent employment over the last 23 years as a tutor, sewing machine

25

operator, food service worker, librarian, suicide watch orderly, Adult Continuing Education instructor, unit librarian, and author. (Exs. 5, 6, 9).

Sims was just twenty-one at the time of his arrest and had only a minor misdemeanor record. (Ex. 10, p. 26). At the time leading up to his trial and sentencing, he suffered from the same cognitive failings of most, if not all, 21-year-old criminal defendants, including an inability to fully comprehend the nature of the proceedings, the significance of his choices and the risks involved. Sims' cognitive failings were exacerbated by the impact his ACEs had on his neurological development growing up. This is apparent not only in his reaction to the offered plea deal, but also in his confusion during his sentencing hearing. (Ex. 10, pp. 2-6, 21-22). Those circumstances were further compounded by his lack of experience with the criminal justice system and, most particularly, the federal system. Had Sims been older, subjected to fewer ACEs, and capable of a more sophisticated understanding of legal proceedings and reasoning, he no doubt would have recognized the overwhelming disadvantages of a trial.

Sims should not continue to be so severely penalized for a decision made as a post-adolescent, half a lifetime ago, given his record of personal development and rehabilitation. Regardless of his intent and his minimal contribution to the crimes committed by the principals, he regrets the harm that occurred. He feels compassion for the individuals and communities that continue to be affected by this and other shared tragedies and shows this, in part, by making payments towards restitution and the Crime Victims Fund. *See* Letter from Jermaine Sims to Clerk of Ct., E.D.Va. (July 6, 2019) (ECF # 278). *See McCoy*, 2020 U.S. Dist. LEXIS 91801 at * 7 (E.D.Va. May 26, 2020) (finding extraordinary and compelling reasons to reduce defendant's sentence because defendant's restitution payment while imprisoned showed matured

decision-making and reform), *aff'd* 981 F.3d 271, 2020 U.S. App LEXIS 37661 (4th Cir. Dec. 2, 2020).  Sims has taken responsibility for his life and his actions by pursuing his education and becoming a mentor who encourages growth and rehabilitation in others.

### 3. *Sims' Record as a Model Inmate and His Educational and Rehabilitative Accomplishments Weigh in Favor of Reducing His Sentence.*

Sims has been a model prisoner and many, including the late Judges Williams and Dohnal, have praised his remarkable growth and accomplishments.  He continues to advance his education, teach and mentor others, and serve as a role model to other prisoners at Butner. Rehabilitation alone is not grounds for finding extraordinary and compelling reasons to reduce a sentence, but courts have treated rehabilitation as a strong factor in favor of granting relief. *See, e.g., Scott*, 2020 U.S. Dist. LEXIS 84313 at * 9-10 (D.Md. May 13, 2020) (finding relief was warranted where defendant maintained a near perfect post-conviction record, completing numerous educational, vocational and rehabilitative programs), *aff'd by McCoy,* 981 F.3d 271, 2020 U.S. App LEXIS 37661 (4th Cir. Dec. 2, 2020); *United States v. Arey*, 461 F.Supp.3d 343, 352 (W.D.Va. 2020) (finding defendant's completion of educational and rehabilitative courses supported relief).  Sims' particularly remarkable record supports a determination that his rehabilitation is one of the extraordinary and compelling reasons that warrant a sentence reduction.

As previously mentioned, Sims has received no institutional infractions of any kind for more than two decades. Indeed, he has dedicated himself to promoting positive values and peaceful solutions through facilitating numerous Principles of Centered Living and Alternatives to Violence classes. Prior to his arrest, Sims had been on a path to enroll at J. Sargeant Reynolds

Community College.  Rather than allow his conviction to change his enthusiasm for learning, Sims has sought out every opportunity to advance his education.  Even knowing he could die in prison, he has pursued not only college courses, but also OASIS computer courses and Adult Continuing Education classes in a wide variety of subjects; having achieved several advanced certifications, Sims continues to find programs to pursue.  Most recently, Sims obtained his paralegal certification from the Blackstone Career Institute, graduating with an average of 97.74% and recognition of being a "Legal Assistant/Paralegal with Distinction." *See, United States v. Clausen,* 2020 U.S. Dist. LEXIS 131070 at 19-20 (E.D. Pa. July 24, 2020) (granting reduced sentence based on defendant's remarkable 20-year record of rehabilitation, including hundreds of hours of education, mentorship and a clean disciplinary record, even while facing an excessive, *de facto* life sentence).[5]  The persuasiveness of *Clausen* by the Fourth Circuit's decision in *McCoy*, 981 F.3d 271, 2020 U.S. App. LEXIS 37661 (4th Cir. Dec. 2, 2020), which affirmed district court cases granting relief for comparable reasons. *See, discussion, supra* at 21-22.

 Throughout his incarceration, Sims has taken every opportunity to better himself, his peers, and his community. He is deserving of mercy and a second chance.  What is absolutely clear is that, had he not passed away, Judge Williams, an experienced and distinguished member of the federal judiciary, would have granted this motion and greatly reduced Mr. Sims' sentence. This Court has the unusual benefit of the post-judgment opinions of a deceased trial lawyer and

---

[5] While Clausen's and Sims' cases are remarkably similar, down to the length of their sentences, the number of years they have served, their records while incarcerated, and even when they were convicted, they are different in that Clausen himself committed the many robberies and firearm offenses with which he was charged, while Sims, as has been oft mentioned here, was an aider and abetter who was not present and did not plan the single bank robbery at issue. Thus, Sims is at least as entitled to relief was Clausen.

sentencing judge, a judge who expressed his support for Sims' release in the only context available to him - Sims' clemency petition.  His unequivocal, oft- stated opinions about Mr. Sims and this case should be given appropriate respect and consideration. *See, e.g.*, *United States v. Evans*, 526 F.3d 155, 162 (4th Cir 2008) (deference to the opinion of the district judge as to the appropriate sentence "is required because '[t]he sentencing judge is in a superior position to find facts and judge their import . . .  in the individual case" (quoting *Gall v. United States*, 552 U.S. 38, 51, 218 S.Ct. 586 (2007)); *United States v. Rusher*, 966 F.2d 868, 884 (4th Cir. 1992) ("accord[ing] significant deference to sentencing judge's sentencing departure determination) (citing *United States v. Terry*, 916 F.2d 157, 167 (4th Cir. 1990)).  The rationale for the deference afforded by courts of appeals to the sentencing determinations of district courts is applicable to this court's consideration of the opinions of the actual sentencing judge's opinion as to the inappropriateness of the mandatory sentence imposed on Mr. Sims.

For the reasons mentioned above, Sims respectfully asks this Court to use the power conferred by the First Step Act to reduce his sentences to time served.  Nothing would be gained by Sims' further incarceration.

## CONCLUSION

With passage of the First Step Act, Congress emphasized the imperative of reducing unnecessary incarceration and avoiding unduly punitive sentences that do not serve the ends of justice. *United States v. Simons*, 375 F.Supp.3d 379, 384-386 (E.D.N.Y. 2019).  The mandatory life sentence imposed on Jermaine Jerrell Sims is inequitable and deserving of compassionate relief.  Sims' service of more than two decades of incarceration for a case the government deemed worthy of no more than three years in prison, his young age at the time of his arrest, his

exemplary institutional record, his remarkable personal growth and rehabilitation, and the enduring support he received from the late Judges Williams and Dohnal establish extraordinary and compelling reasons justifying a sentence reduction.

No criminal justice system, even the best in the world, can be perfect. In a system designed and administered by human beings, mistakes and unforeseen consequences are inevitable.  Nevertheless, a healthy justice system is one that is "constantly introspective, never complacent, always searching for injustices within[,] and determined to address them." Trial Penalty Report at 3 (quoting former District Judge John Gleeson, E.D.N.Y.).  That is why our justice system has "safety valves" for courts to "right" unjust circumstances through discretionary relief.

The sentencing reform movement of a generation ago largely disempowered judges. Congress's amendments to § 3582 compassionate release with the First Step Act granted a vital part of that power back. Sims respectfully requests the Court use that power to grant a sentence reduction based on the extraordinary and compelling reasons presented in his case.

Respectfully Submitted,

**JERMAINE JERRELL SIMS**

By: _s/ Gerald Thomas Zerkin_
Gerald Thomas Zerkin
Attorney-At-Law
Virginia Bar #16270
2620 Stuart Ave., 1C
Richmond, VA 23220
(804) 921-4885
zerkingt@msn.com

Julie E. McConnell
Va. Bar No. 44327
Professor of Law, Legal Practice
Director, Children's Defense Clinic
University of Richmond School of Law

203 Richmond Way
Richmond, VA 23173
804-921-3887
jmcconne@richmond.edu


Robert J. Wagner
Virginia Bar #27493
Assistant Federal Public Defender
Office of the Federal Public Defender
701 E. Broad Street, Ste. 3600
Richmond, VA 23219
(804) 565-0808
Robert_Wagner@fd.org


**CERTIFICATE OF SERVICE**

I hereby certify that I filed the foregoing Motion with the ECF system, this 3rd day of January, 2021, which will send a copy thereof to all counsel of record.

_s/ Gerald Thomas Zerkin_
Gerald Thomas Zerkin
Attorney-At-Law
Virginia Bar #16270
2620 Stuart Ave., 1C
Richmond, VA 23220
(804) 921-4885
zerkingt@msn.com