IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division



| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 3:98-cr-45 |
| ) | |
| JERMAINE JERRELL SIMS, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

THIS MATTER comes before the Court on the Motion of the Defendant, Jermaine Jerrell Sims, for an order reducing his sentence to time served based on the "extraordinary and compelling reasons," pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

On January 30, 1997, two armed men, LaFawn Bobbitt and Rashi Jones, robbed the NationsBank in Richmond, Virginia, killing a bank teller and wounding three others. Two of the three firearms Bobbitt and Jones possessed had been purchased by Sims, using his own name and correct address. Based on that, the Government indicted Sims on February 17, 1998, on six charges related to conspiracy and aiding and abetting a bank robbery resulting in the death of another. Initially, all charges were dismissed on the government's own motion. However, the government obtained superseding indictments on March 26, 1998, and, again, on June 2, 1998, each with an additional two

charges. The indictments charged Sims with conspiracy, in violation of 18 U.S.C. § 371 and § 2 (count 1); aiding and abetting bank robbery, in violation of 18 U.S.C. § 2113(a), (d) and (e) and § 2 (count 2); aiding and abetting use of semi-automatic assault weapon in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1) and § 2 (count 3); aiding and abetting causing death of another through use of a firearm, in violation of 18 U.S.C. § 924(j)(1) and § 2 (count 4); false statement in connection with obtaining a firearm, in violation of 18 U.S.C. § 922(a)(6) and § 924(a)(2) (count 5); and transfer of a firearm for use in a crime of violence, in violation of 18 U.S.C. § 924(h) (count 6).

Prior to trial, Sims was offered a plea agreement, under which he would have pled guilty to one count of *misprision of a felony*, pursuant to 18 U.S.C. § 4, with a statutory maximum sentence of three years in prison. However, Sims proceeded to trial, waiving, on the advice of his attorney, his right to a jury. Contrary to the expectations of Sims' counsel, Sims was found guilty of all charges. He was sentenced to life imprisonment plus 120 months, consisting of 60 months on count 1, mandatory life imprisonment on count 2, life imprisonment on count 4, and 120 months on counts 5 and 6, all to run concurrently, and 120 months on count 3, to run consecutively to the other sentences. Judge Richard Williams made a statement on

2

the record at Sims' sentencing, indicating a life sentence, in this case, amounted to cruel and unusual punishment under the Eighth Amendment, while noting that the Fourth Circuit would not endorse such a conclusion. The Fourth Circuit denied Sims' appeal.

During his many years of incarceration, Sims has been a model prisoner and has received extraordinary support for relief or clemency—most notably from Judge Williams, himself. In one of his several letters to the Pardon Attorney on Sims' behalf, Judge Williams stated, if a case ever deserved pardon relief, Sims' case falls in that category. In another, he emphasized his sincere belief that Sims' situation was a prime example of the inequity and basic unfairness of mandatory minimum sentencing as imposed by congressional mandate. Judge Williams also spoke to Sims' remarkable achievements and the positive attitude in the light of his harsh circumstances. He further praised the way Sims "availed himself of all educational and vocational opportunities available to him." Sims' applications for clemency were denied in 2011 and again in 2017.

On or about January 19, 2020, Sims submitted an electronic request to the warden at FMC Butner that he move this Court for a reduction of his sentence under 18 U.S.C. § 3582(c)(1)(A)(i). As of the date of this filing, no such motion has been filed by BOP. While Sims has filed previous *pro se* motions for relief

3

under 28 U.S.C. § 2255 and previous versions of 18 U.S.C. § 3582(c), this proceeding is the first opportunity for this Court to review Sims' "extraordinary and compelling" circumstances with any substantial legal basis to provide relief.

The Court now has the authority to reduce Mr. Sims' sentence based on the extraordinary and compelling circumstances presented here. The changes made to the compassionate release statute by the First Step Act grant this Court the jurisdiction to hear this motion. Congress' amendments to 18 U.S.C. § 3582(C)(1)(A)(i) have empowered courts with independent authority to decide when extraordinary and compelling circumstances warrant a sentence reduction.

Congress first enacted the modern form of the compassionate release statute contained in 18 U.S.C. § 3582 as part of the Comprehensive Crime Control Act of 1984. Section 3582(c) provides that a district court can modify even a final "term of imprisonment" in four situations, one of which was the existence of "extraordinary and compelling reasons" warranting the reduction, as determined by the sentencing court. 18 U.S.C. § 3582(c)(1)(A)(i). However, though the statute gave courts the final decision-making authority over whether a sentence would be reduced, the statute imposed a gatekeeper—in that authority could be invoked only upon a motion by the Director of BOP. Absent such a motion, sentencing courts were powerless to reduce

4

a prisoner's sentence, even if extraordinary and compelling reasons warranted the reduction. 18 U.S.C. § 3582(c)(1)(A)(i); see also P.L. 98-473 (Oct. 12, 1984).

Due to the amendments to the statutory scheme made by the First Step Act of 2018, district courts are no longer required to wait for a motion by the Director of the BOP to resentence a federal prisoner under 18 U.S.C. § 3582(c)(1)(A)(i). See P.L. 115-391, 132 Stat. 5194, at § 603 (Dec. 21, 2018). The Fourth Circuit Court of Appeals, in United States v. McCoy, addressed this issue holding,

> [T]he First Step Act significantly expanded access to compassionate release under 18 U.S.C. § 3582(c)(1)(A). Prior versions of § 3582(c)(1)(A), which empowers courts to reduce sentences for "extraordinary and compelling reasons," had allowed review of sentences only at the request of the Bureau of Prisons ("BOP"). The First Step Act removed the BOP from that gatekeeping role, authorizing defendants themselves to file for motions for sentence reductions."

United States v. McCoy, 981 F.3d 271, 274 (4th Cir. 2020).

Though not required under the Fourth Circuit's interpretation of the First Step Act, as noted above, Sims submitted an electronic request to the warden at FMC Butner on or around January 19, 2020. As of the date of this filing, BOP has not filed a motion with this Court on Sims' behalf. Because more than 30 days have lapsed since the records office at FMC Butner received Sims' request, and no motion has been filed by the Warden on his behalf, Sims has exhausted all available

5

administrative remedies. Accordingly, Sims is entitled to bring his motion directly to the Court pursuant to 18 U.S.C. § 3582(c)(1)(A), and this Court has jurisdiction to rule on the requested relief.

Congress has not defined what constitutes an "extraordinary and compelling reason" for resentencing under § 3582(c). However, the legislative history confirms that Congress intended for federal sentencing courts to have broad discretion to make those determinations on a case-by-case basis and to reduce fundamentally unfair sentences where such reasons exist. One of Congress' initial goals in passing the Comprehensive Crime Control Act was to abolish federal parole and create a "completely restructured guidelines sentencing system." S. Rep No. 98-225, at 52, 53 n.74 (1983). Yet, with the elimination of parole as a corrective measure in cases warranting early release, Congress recognized that some individual cases need a second look and stressed the need for an alternative review process. It, therefore, allowed for judicial reduction of certain sentences under § 3582(c):

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which *other extraordinary and compelling circumstances* justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been

> later amended to provide a shorter term of imprisonment.

Id. at 55-56 (emphasis added). Rather than having the Parole Commission review every federal sentence from a perspective focusing solely on rehabilitation, Congress conferred broad discretion on the courts to decide, in individual cases, if "there is a justification for reducing a term of imprisonment." Id. at 56.

Congress intended for the situations listed in § 3582(c) to act as "safety valves for modification of sentences," enabling sentence reductions when justified by factors that previously could have been addressed through the (now abolished) parole system. See id. at 121. This approach was intended to keep "the sentencing power in the judiciary where it belongs," rather than with a federal parole board, and permitted "later review of sentences in particularly *compelling situations*." Id. (emphasis added).

The 2018 First Step Act Amendments further clarify Congress's intent for the courts to utilize their judicial wisdom to evaluate whether "extraordinary and compelling reasons" exist in a defendant's case.

The amendments specifically removed the BOP as the sole gatekeeper for compassionate release motions by empowering defendants to file a motion on their own, despite BOP opposition

7

or refusal to support. See 18 U.S.C. § 3582(c)(1)(A); see also McCoy, 981 F.3d at 281 (holding that "Congress amended § 3582(c)(1)(A) to 'remove the Bureau of Prisons from its former role as a gatekeeper over compassionate release petitions'"). The empowerment of defendants to move for compassionate release on their own was "a break with over 30 years of procedure – not a "minor or inconsequential change. Congresspersons called it 'expand[ing],' 'expedit[ing],' and 'improving' compassionate release." United States v. Brooker, 976 F.3d 228, 235 (2d Cir. 2020).

When courts evaluate the applicability of the "extraordinary and compelling reasons" clause, the statute "requires such courts to consider only 'applicable' guidelines." Id. Prior to the 2018 amendments, Guideline § 1B1.13 and Application Note 4(D) were the primary applicable guidelines for BOP evaluations for compassionate release motions. Id. at 233. The language of Guideline § 1B1.13 applies the recommendations and instructions contained therein solely to the BOP. See U.S.S.G. § 1B1.13 (authorizing a reduction "[u]pon motion of the Director of the Bureau of Prisons."). Application Note 4 is similarly constrained, stating that "[a] reduction under this policy statement may be granted *only upon motion by the Director of the Bureau of Prisons.*" U.S.S.G. § 1B1.13, n.4. (emphasis added). The Fourth Circuit held in McCoy that Guideline § 1B1.13

8

does not apply to District Court analyses of compassionate releases motions brought under the First Step Act. See McCoy, 981 F.3d at 281 (holding that "[w]hen a defendant exercises his new right to move for compassionate release on his own behalf . . . § 1B1.13 does not apply, and thus § 3582(c)(1)(A)'s consistency requirement does not constrain the discretion of the district courts); see also United States v. Jones, 930 F.3d 1098, 1105 (6th Cir. 2020).

The McCoy Court also determined that, as of December 2, 2020,

> [T]here is no Sentencing Commission policy statement 'applicable' to the defendants' compassionate-release motions, which means the district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction."

981 F.3d at 283. After establishing that no Sentencing Commission policy exists that is applicable to a court ruling on a post-First Step Act Compassionate Release Motion, the Court held,

> "where the Commission fails to act, then courts must make their own independent determinations of what constitutes an 'extraordinary and compelling reason[]' under § 3582(c)(1)(A), as consistent with the statutory language, which 'directly instructs courts to find that 'extraordinary circumstances exist.'"

Id. (citing United States v. Rodriguez, 451 F. Supp. 3d 392, 400 (E.D. Pa. 2020)).

9

Because Congress clearly intended to revoke the BOP's position as the gatekeeper of compassionate release motions by empowering defendants to move for such relief on their own, courts must be permitted to determine whether "extraordinary and compelling reasons" exist to substantiate a motion under § 3582(c)(1)(A)(i). See generally id. The Guidelines that were applicable to the evaluation of "extraordinary and compelling reasons" prior to the First Step Act in 2018 are not applicable to motions made by defendants, as those Guidelines explicitly constrain their application to "motion[s] from the Director of the Bureau of Prisons." See McCoy, 981 F.3d at 276. The Sentencing Commission has not, as of December 2, 2020, introduced any applicable policy statements that would constrain the Court's discretion. Consequently, the Court is free to evaluate and determine, for itself, whether a defendant's circumstances qualify as "extraordinary and compelling" under § 3583(c)(1)(A). See id. at 283. See also Brooker, 976 F.3d at 235; Jones, 930 F.3d 1098, 1105; United States v. Gunn, 960 F.3d 1178, 1179 (7th Cir. 2020).

Judges may now assess cases individually and grant sentence reductions—even in the face of BOP inaction, delay, or direct resistance—on a full array of grounds reasonably encompassed by the "extraordinary and compelling" language of the statute. See, e.g., McCoy, 981 F.3d at 288 (holding the district court

10

properly "took seriously the requirement that they conduct individualized inquiries, basing relief not only on the First Step Act's change to sentencing laws . . . but also on such factors as the defendants' relative youth at the time of their offenses, their post-sentencing conduct and rehabilitation, and the very substantial terms of imprisonment they already served"). The McCoy Court further found that "when a defendant exercises his new right to move for compassionate release on his own behalf, § 3582(c)(1)(A)'s consistency requirement does not constrain the discretion of the district courts." 981 F.3d at 281. Thus, this Court has the authority to define the contours of what constitutes "extraordinary and compelling reasons" for purposes of § 3582(c)(1)(A)(i) and make an independent assessment of whether the circumstances of Sims' case warrant a reduction of his harsh sentence.

In determining whether an individual's sentence should be reduced, the Court must decide, *inter alia*, whether he or she presents a danger to the safety of any other person or to the community based on the factors enumerated in 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13(2). When an individual is not a danger, the Court should assess whether the individual's sentence complies with the purposes for sentencing and consider the factors set forth in 18 U.S.C. § 3553(a).

11

Sims' history and record conclusively demonstrate he is not a danger to others or to the community. To the contrary, if released, he would be a contributing member to his community. Further, the § 3553(a) factors weigh strongly in favor of relief in Sims' case.

Sims is neither a danger to the community, nor to any other person. The circumstances of Sims' involvement in the Nationsbank robbery and the evolution of his character over the nearly twenty-two years he has been incarcerated precludes a finding that he poses a danger.

Sims' life sentence was not based on an assessment of his future dangerousness or any perceived need to incapacitate him. Sims had no felony record or history of violence, prior to his arrest on the charges for which he is presently incarcerated; he had only a minor misdemeanor record. Sims' life sentence was, instead, the result of an inflexible, minimum sentence mandate that produced the most extreme trial penalty the judicial system can impose on a defendant who exercises his constitutional right to a trial and to hold the government to its burden of proof. Indeed, Judge Williams stated that sentencing Sims to life imprisonment was a painful experience and he expressed frustration at not being able to depart from the mandatory minimum, even though Sims' culpability relative to that of the perpetrators was less and several unique evidentiary

circumstances weighed against him receiving the same mandatory life sentence to which the actual perpetrators were sentenced.

The fact that Sims was not only released pending trial, but also offered a plea deal with a three-year maximum sentence, underscores how neither the Court, nor the government, viewed Sims as a danger. Sims remained steadily employed pending and during the trial.

Sims' record since his incarceration confirms his lack of dangerousness. Sims has not received any infractions or intuitional charges of any kind since 1999. Rather, he has spent his time pursuing every opportunity to improve his mind and character. Sims has participated in thousands of hours of programs, including well over 100 educational classes, and had become a Transitions Inmate Mentor, a facilitator for Alternative to Violence Project Classes and a Suicide Watch Companion.

Additionally, Sims' work supervisor has noted that he is self-driven, dependable, and a vital team-member, who constantly seeks self-improvement and assists others. And Sims was observed by a re-entry professional to be respectful, helpful, and a positive force for any employer, group, or project to which he applies himself.

Sims' conduct demonstrates his dedication to preventing violence, his encouragement of true rehabilitation in others, as

13

well as in himself, and his belief that second chances should be earned through hard work and sincere self-improvement. Sims has become a role model for other inmates and a man who would be an asset, rather than a danger, to the community.

At its heart, sentencing law, and the constitutional demands that underlie it, embody our society's sense of fundamental fairness. Above all else, sentencing demands that punishment fit the crime. Thus, 18 U.S.C. § 3553(a) calls for a sentence that is sufficient, *but not greater than necessary*, to comply with the particular purposes that justify sentencing. These purposes are defined by § 3553(a)(2), which states, among other factors, that an imposed sentence must reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

In passing the First Step Act, Congress concluded that the punishments arising from stacking provisions of 18 U.S.C. § 924(c) were too punitive and unfair, and courts, including the Fourth Circuit Court of Appeals, have overwhelmingly responded by granting compassionate release for disproportionate sentences.

While "aiding and abetting" historically results in the same treatment as that applied to a principal in the offense, Sims' sentence is disproportionate. In eliminating the stacking of § 924(c) charges, see § 924(c)(1)(C), Congress demonstrated

14

its intent to address inequitable sentencing caused by mandatory sentencing constraints and common, unreasonable prosecutorial practices. The mandatory minimum behind Sims' sentence, and its stark departure from the plea he was offered, make Sims' circumstances just such a case.

Mandatory minimum sentencing mandates have been criticized by judges and attorneys alike as blunt instruments that, rather than serving their original, intended purpose—"to impose harsher punishments on a select group of the most culpable defendants"—have instead resulted in unfair sentences and a severe power imbalance during plea negotiations. While presiding judges are meant to retain ultimate authority over final sentencing decisions, in practice, mandatory minimum sentence statutes prevent judges from exercising discretion. Rather than allow assessment of culpability and mitigating circumstances on a case-by-case basis, mandatory minimum penalties are triggered solely by the prosecutor's charging decisions. Compassionate release and § 3582(c) provide an appropriate method to give secondary review to these sentences and remedy any inequities. Courts considering § 3553(a) factors have found sentencing courts' concerns about mandatory minimums and sentence disproportionality support finding extraordinary and compelling reasons to reduce a sentence.

15

Sims' culpability in providing a firearm to another is simply not the same as that of two perpetrators who robbed a bank and fatally shot a teller. Although the law makes no distinction between aiders and abetters and principals in the first degree, Mr. Sims' role in the bank robbery was different from that of the principal perpetrators.

Sims' life sentence was a substantial penalty when he had been offered a maximum three-year sentence prior to trial. By rejecting a plea bargain and exercising his right to a jury trial, Sims received a life sentence for an act the government thought deserved a maximum of three years.

While Sims was not a juvenile at the time of his arrest when just twenty-one years old, the Miller v. Alabama, 567 U.S. 460 (2012) factors can nonetheless be considered in determining the existence of extraordinary and compelling reasons under § 3582(c). See McCoy, 981 F.3d at 286 (holding the district court was correct to "focus[] on the defendants' relative youth—from 19 to 24—at the time of their offenses, a factor that many courts have found relevant under § 3582(c)(A)(i)"). See also United States v. McCoy, No. 2:03-cr-197, 2020 U.S. Dist. LEXIS 91801 (E.D. Va. May 26, 2020) (referencing Miller neurological development, decision-making, and reform factors in assessing extraordinary and compelling reasons for a defendant arrested at nineteen), aff'd, 981 F.3d 271 (4th Cir. 2020).

16

While the Miller categorical ban on mandatory sentences for life without parole for juveniles does not technically apply to defendants in their low to mid-twenties, research demonstrates that such individuals still experience many of the same behavioral, psychological, and neurological development factors that affect the ability to understand risks and consequences and to make informed, mature decisions. Thus, even without a categorical ban, several courts within the Fourth Circuit have found arrest at a young age, particularly when accompanied by a minimal prior criminal history and subsequent rehabilitation, favors sentence reduction in most cases. See McCoy, 981 F.3d 271, 286 (4th Cir. 2020) (finding the courts' consideration of the defendants' age of 19 a relevant factor to consider for compassionate release analyses); United States v. Scott, No. 95-202-CCB-2, 2020 U.S. Dist. LEXIS 84313, *9 (D. Md. May 13, 2020) (finding defendant's age of 23 and lack of prior criminal record favored relief); United States v. Bryant, No. 95-202-CCB-3, 2020 U.S. Dist. LEXIS 75681, at *9-10 (D. Md. April 30, 2020) (noting relative youth—24 years old—and minimal prior criminal record, combined with good post-sentencing conduct greatly favored relief), aff'd, McCoy, 981 F.3d at 288; United States v. Decator, 452 F. Supp. 3d 320, 325-26 (D. Md. April 6, 2020), aff'd, McCoy, 981 F.3d at 288; United States v. Maumau, 2:08-cr-00758, 2020 U.S. Dist. LEXIS 28392, at *17 (D.

Md. Feb. 18, 2020), aff'd, 2021 U.S. App. LEXIS 9510 (10th Cir. Apr. 1, 2021).

Sims was 21 years old at the time of the incident which, according to the scientifically established and verified research, means the regions of his brain that govern impulse control, planning, and risk avoidance were underdeveloped. That manifested itself, most obviously, by his willingness to risk a life sentence to prove the point of his innocence, even though he knew he had sold the guns used in the robbery.

Sims has been a model prisoner and many have praised his growth and accomplishments. He continues to advance his education, teach and mentor others, and serve as a role model to other prisoners at Butner. Rehabilitation alone is not grounds for finding extraordinary and compelling reasons to reduce a sentence, but courts have treated rehabilitation as a strong factor in favor of granting relief. Sims' record supports a determination that his rehabilitation is one of the extraordinary and compelling reasons that warrant a sentence reduction.

Sims has received no institutional infractions of any kind for more than two decades. Indeed, he has dedicated himself to promoting positive values and peaceful solutions through facilitating numerous Principles of Centered Living and Alternatives to Violence classes. Sims has sought opportunities

18

to advance his education. He has pursued not only college courses, but also OASIS computer courses and Adult Continuing Education classes in a wide variety of subjects; having achieved several advanced certifications, Sims continues to find programs to pursue. Most recently, Sims obtained his paralegal certification from the Blackstone Career Institute.

The mandatory life sentence imposed on Jermaine Jerrell Sims is inequitable and deserving of compassionate relief. Sims' service of more than two decades of incarceration for a case the government deemed worthy of no more than three years in prison, his young age at the time of his arrest, his institutional record, his personal growth and rehabilitation, and the enduring support he received from the late Judges Williams and Dohnal establish extraordinary and compelling reasons justifying a sentence reduction.

For the foregoing reasons, the Defendant's Motion to Reduce His Sentence to time served should be granted.

*Claude M. Hilton*
CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
April 23, 2021

19